UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DAVID A. DENNING, deceased, )
b/n/f JOE DENNING, )
o/b/o/ OLIVIA DENNING, )
minor daughter of DAVID A. DENNING, )
)
    *Plaintiffs*, ) No. 3:06-0906
) Judge Nixon
v. ) Magistrate Judge Bryant
)
METROPOLITAN GOVERNMENT )
OF NASHVILLE and DAVIDSON )
COUNTY, RONAL W. SERPAS, )
DON DAVIDSON, Individually, and )
in their official capacity, )
)
    *Defendants.* )

## MEMORANDUM ORDER

Plaintiffs in this case have brought a civil action pursuant to 42 U.S.C. § 1983 alleging that Defendants Officer Don Davidson and the Metropolitan Government of Nashville (collectively, "Defendants") deprived Plaintiffs' decedent David A. Denning ("Denning") of his rights under the Second, Fourth and Fourteenth Amendments to the United States Constitution when Defendant Officer Don Davidson ("Officer Davidson" or "Defendant Davidson") fired his weapon resulting in Denning's death.[1] Pending before the Court is Defendants' Motion for Summary Judgment (Doc. No. 37) seeking dismissal of all claims remaining after this Court's earlier dismissal of certain claims (see Doc. No. 32). Plaintiffs have filed a Response in opposition (Doc. No. 45), and Defendants have filed a Reply (Doc. No. 48). For the reasons stated herein, Defendants' Motion for Summary Judgment is **GRANTED**.

---

[1] Officer Ronal W. Serpas was dismissed without prejudice pursuant to Plaintiffs' Notice of Voluntary Dismissal. (Doc. No. 20.) Jeanette Webb, mother of minor daughter Olivia Denning, was added as a Plaintiff on June 22, 2007. (Doc. No. 27).

1

I.  BACKGROUND

   A.  **January 27, 2006 Incident**

On the evening of January 27, 2006, 15 calls were placed in the course of an hour and a half from a cellular telephone belonging to David Denning to a local Papa John's Pizza store.[2] The man who called each time was belligerent, cursing at the employees who answered his calls.[3] After a number of such calls, the pizza store manager informed the caller that the store would not do business with him that evening, and then called the police non-emergency number to lodge a formal complaint of harassment.

However, a food order from one of the placed calls was accidentally processed, and a pizza order for "David" was scheduled to be delivered at the upstairs entrance of Denning's address that evening. When the delivery woman ("Ms. Scott") arrived at the back of Denning's residence, she noticed a black dog barking outside. Out of concern that the dog might bite her, she called the telephone number on the order ticket and asked the man to come outside to get the pizza. Ms. Scott then heard things banging around indoors "like he lost his balance or something" and saw a man come from the second floor apartment onto the landing area of the stairs, weaving back and forth. Upon the man's assurance that the dog would not bite, Ms. Scott climbed the stairs leading up to Denning's second floor apartment. She could smell alcohol on his breath. Ms. Scott asked the man if he had a pen to sign the credit card slip, but he said "no," took the pizza out of her hands and thanked her. She reiterated that he needed to sign the credit

---

[2] Unless otherwise noted, all facts are taken from Plaintiff's Response to Defendants' Statement of Undisputed Material Facts (Doc. No. 46), Defendants' Response to Plaintiffs' Statement of Undisputed Facts (Doc. No. 49), and the exhibits referenced in both filings (see Doc. Nos. 37 parts 2-12; 45 parts 2-4; 48 part 2).

[3] Plaintiffs vigorously maintain that no evidence in the record establishes that Mr. Denning was the man interacting with Papa John's that evening.

2

card slip, but the man said, "have a good night," went back into the apartment with the food, and closed the door.

Ms. Scott retrieved an ink pen from her car and ascended the stairs a second time. As she approached Denning's back door and knocked, she saw the man sitting on the couch eating pizza. Ms. Scott watched the man get up, walk to a counter area, unzip a black bag, pull a gun out from the bag, and walk towards her with the gun pointed in her direction. Immediately, Ms. Scott turned around and fled down the stairs, hearing the back door open behind her as she descended. She hid briefly, looking back towards the stairs to see if the man was close behind her. Seeing no one she ran to her car and called 911. Ms. Scott informed the 911 operator that the man pulled a gun on her when she returned with a pen for him to sign a credit card receipt. She provided the operator a physical description of the man, and said that he was "so intoxicated he's falling all over his apartment." (Doc. Nos. 37-F, 44). Ms. Scott was told to standby and she agreed to wait for the police at a nearby intersection. (Doc. No. 37-F).

Metropolitan Nashville Police Officer Davidson responded to the dispatcher's call and arrived at the scene some minutes later. He spoke with Ms. Scott who repeated the details of the incident to him. Officer Greg Lyons ("Officer Lyons") arrived at the scene shortly thereafter, and Officer Davidson informed Officer Lyons of Ms. Scott's encounter. Together the two officers approached the back of the building, which was dark and had no outdoor lighting, with flashlights on and weapons drawn. After searching around the outdoor area to be sure the man was not hiding, the officers ascended the stairs to the second floor apartment. Officer Davidson turned off his flashlight and positioned his gun in the "low-ready" position – pointing at the ground. He approached the landing at the top of the stairs while Officer Lyons remained on a landing halfway up the stairs. From the window on the top part of the apartment door, Officer

3

Davidson saw Denning sitting at a desk about 20 feet away. A bottle of liquor was on the desk. Officer Davidson tapped on the door a few times with his flashlight, but did not identify himself as a police officer. According to Officer Davidson's testimony, Denning turned around, looked at the door, and walked towards the door. As Denning passed a kitchen counter about eight (8) or nine (9) feet away from Office Davidson, Denning reached into a black bag resting on the counter and withdrew a handgun.

The parties disagree as to Denning's actions after he reached for his gun. Defendants, relying on an interview given by Officer Davidson the night of the incident and Officer Davidson's deposition testimony in this case, maintain that after Denning pulled the handgun from the bag, he pointed the gun in an "elbow over holster" position such that the gun was pointed straight out at the door and at Officer Davidson. (Doc. Nos. 39, 37-8 at 40; 48-2). Plaintiffs argue that the evidence supports a different version of Denning's actions, one in which Denning held a gun, but did not point it at Officer Davidson. (Doc. No. 46). In support of their assertion, Plaintiffs point to another account of the evening's incident prepared by Officer Davidson. In his one-page "Use of Force Report" (Doc. No. 45-3), Officer Davidson wrote, "He walked toward me. He stopped and pulled a handgun out of a black bag and continued to walk toward me. I yelled at him to drop the gun but he continued to walk toward me." (Id.). Based on this statement, Plaintiffs argue that the Denning's gun was not pointed at Officer Davidson.

Thereafter, the material facts surrounding the remainder of that night's events are again uncontested. Officer Davidson shouted to Officer Lyons – whose view of the apartment door was obstructed from his position on the lower landing – that the man had a gun. Officer Davidson then turned away from the door to retreat down the stairs, but could not see the stairs while his eyes adjusted from the well-lit apartment to the dark outdoors. The landing on which

4

Officer Davidson stood was only as wide as the doorway, giving Officer Davidson no room to step out of Denning's direct path. As Denning continued to walk towards the door with the gun, Officer Davidson shouted twice at him to drop his gun. Denning did not drop his gun and continued walking towards the door. When Denning was about three (3) or four (4) feet from the door, Officer Davidson fired a single shot through the window of the door, striking Denning in the chest.

After he ascertained that Denning was on the floor and not moving, Officer Davidson kicked the door open and kicked the weapon away from Denning. Officer Davidson ordered Denning to get his hands out so that they were visible, but Denning replied that he could not get his breath. Officer Davidson reached down and pulled Denning's hands out from under him. Officer Lyons advised the dispatcher that Denning had been shot and called for an ambulance. Denning was transported by ambulance to Vanderbilt University Medical Center where he died from the gunshot wound. Samples taken during an autopsy later revealed that Denning's blood alcohol level was in the range of .12% to .13%.

**B.  Metropolitan Police Policy**

Metropolitan Police Department of Nashville General Order 05-21 establishes the department's policy on the use of force. (See Doc. No. 37-12). The policy states that "authorized employees shall use only that force reasonably necessary to effect lawful objectives." (Id. at 1). Specifically, "[a]uthorized employees may use deadly force when they have a reasonable belief that the action is immediately necessary to prevent imminent death or serious bodily injury of a human being, including the employee." (Id. at 11). According to the testimony of Defendants' expert, Sergeant Robert Allen, Jr., neither General Order 05-21 nor

5

any training related to use of deadly force to his knowledge required Officer Davidson to identify himself as a police officer prior to ordering Denning to drop his weapon.

## II. LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All facts, and reasonable inferences to be drawn from those facts, must be viewed in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In order to succeed, the moving party must show that there is an absence of evidence to support the non-moving party's case and that "the evidence is so one-sided that one party must prevail as a matter of law." Lexington-South Elkhorn Water Dist. v. City of Wilmore, 93 F.3d 230, 233 (6th Cir. 1996). A movant for summary judgment makes a sufficient showing by informing the court of the basis of its motion and by identifying the portions of the record that reveal that there are no genuine material fact issues to support the non-movant's case. See Celotex v. Catrett, 477 U.S. 317, 323 (1986).

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. See id. The non-movant may not rely solely on conclusory allegations in the pleadings to defeat a motion for summary judgment, but must come forward with affirmative evidence that establishes its claims and raises genuine issues of material fact. Id. at 324. "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment will be denied. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

6

However, if the evidence offered by the non-moving party is "merely colorable," "not significantly probative," or not enough to lead a fair-minded jury to find for the non-movant, the motion for summary judgment should be granted. Id. at 249. It is with these standards in mind that the Court analyzes the parties' arguments and evidence.

## III. ANALYSIS

### A. Second Amendment claim against Defendants

Defendants move for summary judgment on Plaintiffs' claim that Denning was deprived of his Second Amendment right to carry a weapon, arguing that Second Amendment protections are inapplicable here for two reasons. (See Doc. Nos. 38, 48). First, Defendants maintain that the restrictions of the Second Amendment apply only against the federal government, not the states, citing the Supreme Court's opinion in Presser v. Illinois. 116 U.S. 252 (1886). (Doc. No. 38). Second, Defendants argue that binding precedent in the Sixth Circuit has unequivocally established that the Second Amendment does not give an individual person the right to bear arms. (Doc. No. 48). Plaintiffs in their Response argue that recent appellate cases discredit both arguments. Specifically, Plaintiffs contend that United States v. Emerson, 270 F.3d 203 (5th Cir. 2001) and Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007) conclusively establish that Plaintiffs' Second Amendment cause of action is valid. (Doc. No. 45).

In Presser v. Illinois, the Supreme Court held that the Second Amendment "is a limitation only upon the power of [C]ongress and the national government, and not upon that of the state." 116 U.S. 252, 265 (1886). In so holding, the Court also reaffirmed its earlier decision in United States v. Cruikshank, 92 U.S. 542, 553 (1875) ("This is one of the amendments that has no other effect than to restrict the powers of the national government . . . ."). Despite the fact that Presser

7

is more than a century old, the rule that the Second Amendment restricts the federal government alone is still applied by federal courts, including the Sixth Circuit. See Peoples Rights Org., Inc. v. City of Columbus, 152 F.3d 522, 538 n.18 (6th Cir. 1998) (citing Presser and Cruikshank for the conclusion that "[t]he Supreme Court has held that the Due Process Clause of the Fourteenth Amendment does not incorporate the Second Amendment; hence, the restrictions of the Second Amendment operate only upon the Federal Government").

Furthermore, Plaintiffs stand on an incorrect assertion that the courts in Emerson and Parker extended the restrictions under the Second Amendment to apply to the states. Significantly, neither case was directly faced with the issue, as the Second Amendment claims were brought by individuals against the federal government, not a state or local government. See Emerson, 270 F.3d 203; Parker, 478 F.3d at 391 n.13 (noting that the District of Columbia is a Federal District ultimately controlled by Congress). At most it can be said that both courts in Emerson and Parker questioned in dicta the logic of the Supreme Court's holdings in Presser and Cruikshank given that these cases were decided long before the Supreme Court incorporated other provisions of the Bill of Rights under the Fourteenth Amendment. See Emerson, 270 F.3d at 222 n.13; Parker, 478 F.3d at 391 n.13. This argument in favor of expanding the Second Amendment to apply to states has been raised by other courts, albeit only as an aside without deciding the issue. See, e.g., Silveira v. Lockyer, 312 F.3d 1052, 1067 n.17 (9th Cir. 2002). Despite these dicta, the position of the Supreme Court and of the Sixth Circuit has not changed since Presser. *Stare decisis* therefore requires this Court to conclude that Plaintiffs in this case do not have a valid claim of a Second Amendment violation against Defendants.

Even if the Court were to determine that the restrictions under the Second Amendment apply to state and local governments, Plaintiffs face another hurdle in establishing that

individuals possess the right "to keep and bear arms." U.S. CONST. amend. II. On this issue, the Sixth Circuit has repeatedly and consistently concluded that the Second Amendment provides no such right to individuals. United States v. Bournes, 339 F.3d 396, 397 (6th Cir. 2003); United States v. Napier, 233 F.3d 394, 402 (6th Cir. 2000); United States v. Baker, 197 F.3d 211, 216 (1999); United States v. Warin, 530 F.2d 103, 106 (6th Cir. 1976). While the Court is aware that courts in Emerson, 270 F.3d at 260, and Parker, 478 F.3d at 395, have held to the contrary, these opinions are decisions from courts beyond this circuit. This Court is bound to apply the unequivocal rulings of the Sixth Circuit.[4] Summary judgment in favor of Defendants with respect to Plaintiffs' Second Amendment claim is **GRANTED**.

## B. Availability of Qualified Immunity Defense for Officer Davidson

Defendants next argue that dismissal of the Fourth Amendment excessive force claim against Officer Davidson is necessary because he is entitled to qualified immunity from this suit. A government official performing a discretionary function is generally "shielded from liability" so long as his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

---

[4] The Court recognizes that the Supreme Court has granted *certiorari* in part for Parker. District of Columbia v. Heller, 128 S.Ct. 645 (2007). The Supreme Court is expected to address whether certain provisions of the District of Columbia Code violates the Second Amendment rights of individuals "who are not affiliated with any state-regulated militia, but who wish to keep handguns and other firearms for private use in their homes." Id. This Court finds it unnecessary to hold its current decision on Plaintiffs' Second Amendment claim in abeyance until the Supreme Court's ruling is issued; the premise of the instant case is so dissimilar from Parker, that the outcome of the Supreme Court's review on the issue will have no significant impact on Plaintiffs' claim. Plaintiffs' Second Amendment claim is not only crippled because it is brought by individuals against a local government, but the claim fails on the merits without any supporting evidence in the record that would substantiate an assertion that Denning was deprived of a right to keep and bear arms.

9

"Qualified immunity is *an immunity from suit* rather than a mere defense to liability; and like an absolute immunity it is effectively lost if a case is erroneously permitted to go to trial." Marvin v. City of Taylor, 509 F.3d 234, 243 (6th Cir. 2007) (emphasis in original) (quoting Scott v. Harris, 127 S.Ct. 1769, 1774 n.2 (2007)); see also Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). If qualified immunity applies, it will defeat a plaintiff's constitutional claim against a police officer who made "a decision that, even if constitutionally deficient, reasonably misapprehend[ed] the law governing the circumstances." Marvin, 509 F.d at 243 (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)); see also Saucier v. Katz, 533 U.S. 194, 206 (2001) ("Qualified immunity operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force.'").

Once the qualified immunity defense is raised by the defendant, it becomes the plaintiff's burden to show that the defendant is not entitled to qualified immunity. Untalan v. City of Lorain, 430 F.3d 312, 314 (6th Cir. 2005); Cartwright v. City of Marine City, 336 F.3d 487, 490-91 (6th Cir. 2003); Blake v. Wright, 179 F.3d 1003, 1007 (6th Cir. 1999). The Court must look to the plaintiff's showing and, after considering the facts in the light most favorable to the plaintiff, address two (2) questions to determine whether qualified immunity is appropriate: (1) whether the facts alleged establish the violation of a constitutional right; and (2) whether that constitutional right was clearly established. Saucier, 533 U.S. at 200. If, when answering the first question, the conclusion is that no constitutional right has been violated, no further inquiry is necessary. Id. at 201. However, if a constitutional violation is found, the Court must then decide whether that right was clearly established. This determination "must be undertaken in light of the specific context of the case, not as a general broad proposition." Id. Specifically, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is

whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Brosseau, 543 U.S. at 199 (quoting Saucier, 533 U.S. at 202).

Accordingly, the Court's first objective is to determine whether Officer Davidson violated Denning's constitutional rights. Here, Plaintiffs contend that Defendant Davidson violated Denning's Fourth Amendment right to be free from excessive force. (Doc. No. 45). Claims that law enforcement officials have used excessive force, deadly or not, to effectuate an arrest, investigatory stop, or seizure of a person should be analyzed under the Fourth Amendment and it's "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 388 (1989); see also, Livermore v. Lubelan, 476 F.3d 397, 404 (6th Cir. 2007). It is well established that the Fourth Amendment prohibits an officer from using deadly force to seize an unarmed, non-dangerous suspect. Livermore, 476 F.3d at 404 (citing Tennessee v. Garner, 471 U.S. 1, 11 (1985)). If, however, "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," deadly force is constitutionally permissible. Garner, 471 U.S. at 11.

To analyze whether an officer's use of deadly force was "objectively reasonable," the Court is to pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Furthermore, the reasonableness of the officer's use of force is to be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and must account for "the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97.

Considering the facts and circumstances as alleged by Plaintiffs, the Court finds that Officer Davidson acted reasonably in firing his gun at Denning. The record as a whole shows that Officer Davidson approached the situation with knowledge that the man in the house was likely intoxicated and had pulled out a gun in response to a pizza delivery woman's request to sign a credit card slip earlier in the evening. When Officer Davidson knocked on Denning's door, he saw Denning pick up the gun, point it in his direction, and silently continue to walk towards the door, ignoring commands to drop the weapon. Glancing back towards the dark porch and stairs, Officer Davidson was forced to make a split-second decision that he was not safe and that retreat was not feasible. These factors compel a finding that Denning posed a serious threat to Officer Denning's safety such that Officer Denning's use of deadly force was permissible. Indeed, in similar cases where an officer was faced with an armed suspect posing an imminent threat, the Sixth Circuit has found the officer's use of deadly force to be reasonable. Livermore, 476 F.3d at 405-06 (upholding qualified immunity for officer where deadly force was used on a suspect pointing his gun at other officers); Boyd v. Baeppler, 215 F.3d 594, 603-04 (6th Cir. 2000) (upholding qualified immunity for police officer who used deadly force against a suspect pointing a gun at the officer and others); Bell v. City of East Cleveland, No. 96-3801, 1997 WL 640116, at *4 (6th Cir. Oct. 14, 1997) (upholding qualified immunity for officer who shot and killed a boy pointing a toy gun at officer); Rhodes v. McDannel, 945 F.2d 117, 120 (6th Cir. 1991) (upholding qualified immunity for officer who shot and killed a homeowner who approached officers with a raised machete in hand, ignoring warnings to drop the weapon).

Plaintiffs argue that the shooting was excessive force because evidence indicates that Denning, although he held the gun in his hand, did not point it at Officer Davidson. (Doc. No. 48). The Court notes that the position of the gun in the suspect's hand is not dispositive in

12

determining whether the use of force was excessive. See Bell at *4 n.1 (citing with approval appellate decisions finding reasonable use of force where the weapon was not pointed directly at the officer). What is more, Plaintiffs' argument is no more than a hypothetical assertion with no support in the record.

Plaintiffs' theory that Denning did not point his gun at Officer Davidson is hinged entirely on a single piece of evidence that is silent on the issue – Officer Davidson's "Use of Force Report" makes no mention of the gun's direction after Denning picked it up from the counter. Plaintiffs, therefore, interpret the lack of description to mean that Denning did not have his gun pointed at Officer Davidson. (Doc. No. 45). While it is not the Court's role at the summary judgment phase to weigh the evidence in order to determine the truth of the matter, Sagan v. United States, 342 F.3d 493, 497 (6th Cir. 2003), on this issue, the Court finds that Plaintiffs have presented no material question of fact. Officer Davidson's "Use of Force Report," is simply silent as to the gun's positioning once it was in Denning's hands. The Court notes that the template for this report provides officers less than a page's worth of space to describe an incident, and it is entirely understandable that Officer Davidson did not think to include every detail of the incident on the form. (See Doc. No. 45-3). More importantly, the lack of detail in the "Use of Force Report" provides no contradiction to other, more developed accounts of the shooting incident that consistently establish that Denning pointed his gun "elbow over holster" directly at Officer Denning. (Doc. Nos. 37-8 at 40, 48-2). As no reasonable juror could conclude that Officer Davidson's two accounts of the incident are inconsistent with one another, this Court will not adopt Plaintiffs' version of the facts regarding the gun's direction. See Scott, 127 S.Ct. at 1776 ("When opposing parties tell two different stories, one of which is

13

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion.").

Given the facts established in the record, the Court finds that Officer Davidson did not use excessive force in violation of Denning's Fourth Amendment rights. The second question in determining the applicability of qualified immunity – whether Denning had a clearly established constitutional right not to be fired upon – is therefore moot. Saucier, 533 U.S. at 201. Defendant Denning's defense of qualified immunity is **GRANTED** and all claims brought against him in this suit are **DISMISSED**.

### C.     Municipal Liability under § 1983

Defendants lastly move to dismiss Plaintiffs' causes of action against Metropolitan Government under § 1983 for failure to "train, supervise and discipline" Officer Davidson, and for maintaining a custom, practice, or policy of using unreasonable force. (Doc. No. 1 at ¶ 14). Defendants contend that Plaintiffs cannot establish the requisite proof needed to survive summary judgment. (Doc. No. 38).

In order to succeed in a § 1983 suit against a municipality, a plaintiff must demonstrate that he was deprived of a constitutional right, and that the municipality is responsible for that violation. Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist., 455 F.3d 690, 700 (6th Cir. 2006); Doe v. Claiborne County, 103 F.3d 495, 505-06 (6th Cir. 1996). A municipality is not liable under § 1983 merely for employing a tortfeasor, or in other words, under a theory of *respondeat superior*. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). "Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694 (1978). Plaintiffs may prove the existence of an illegal policy or custom by various means, including "(1) the municipality's legislative

14

enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005) (internal citations omitted).

To prevail on a custom, practice, or policy claim, Plaintiffs must demonstrate: (1) a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act amounts to an official policy of inaction, and (4) that the defendant's custom was the moving force or direct causal link in the constitutional deprivation. Doe, 103 F.3d at 508.

If liability is premised on failure to supervise, control or train, a plaintiff must establish that "the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." Ontha v. Rutherford County, Tenn., 222 F. App'x 498, 504 (6th Cir. 2007) (quoting Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999), *cert. denied*, 530 U.S. 1264 (2000)). Accordingly, "[a]t a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." Id. Where a defendant's failure to train is alleged, "it is not enough to point after the fact to a particular sort of training which, if provided, might have prevented the harm suffered in a given case." Id. Instead, liability will be found "only if a constitutional violation is 'part of a pattern' of misconduct or 'where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to occur." Id. (quoting Hays v. Jefferson County, 668 F.2d 869, 874 (6th Cir. 1982), *cert. denied*, 459 U.S. 833 (1982)).

15

As determined in the previous section, Plaintiffs have not affirmatively established that Denning was deprived of a constitutional right. Even if the Court were to assume *arguendo* that there was a constitutional violation established in this matter, Plaintiffs must still establish facts to support their claims that the Metropolitan Government was responsible for a constitutional violation. Doe, 103 F.3d at 505-06. This, they fail to do.

Plaintiffs contend that the Metropolitan Police Department has a policy for use of deadly force that "authoriz[es] deadly force in essentially any situation" because there is no requirement for an officer to identify himself as police, and furthermore police officers are permitted to determine when to use deadly force based on a subjective standard. (Doc. Nos. 45). To the extent Plaintiffs contend that the Metropolitan Police Department of Nashville's General Order 05-21 is an illegal policy, the argument has no merit. General Order 05-21 tracks the language of Tennessee v. Garner, which conclusively held that deadly force may be used where there is probable cause to believe that a suspect poses a threat of serious physical harm, and that "statutes with such application would pass constitutional muster." 471 U.S. at 11. Plaintiffs have otherwise set forth no evidence to establish an illegal custom, practice, or policy. They have no factual support to prove that any official was aware of illegal conduct, or that there was deliberate indifference towards such conduct. Neither have Plaintiffs proffered a modicum of evidence that would indicate a failure to supervise or train. Plaintiffs have not met their burden in proving their § 1983 claims against the Metropolitan Government, and the Court **GRANTS** summary judgment in favor of Defendants on these claims.

### III. CONCLUSION

16

For the reasons discussed herein, Defendants' Motion for Summary Judgment is **GRANTED** and Plaintiffs' claims are **DISMISSED.**

It is so ORDERED.

Entered this the 16th day of June, 2008.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT